# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| HUNTER SMITH, | § § § | Civil Action No. _____ |
| Plaintiff, | § § | |
| vs. | § § | |
| BAYER CORPORATION, BAYER HEALTHCARE PHARMACEUTICALS INC. (As Successor in Interest of Bayer Pharmaceuticals Corporation), And BAYER SCHERING PHARMA A.G. | § § § § § § § | |
| Defendants. | § | October 28, 2009 |

## COMPLAINT

1.      Plaintiff Hunter Smith, by the undersigned counsel, hereby submits this Complaint against Defendants BAYER CORPORATION, BAYER HEALTHCARE PHARMACEUTICALS INC., and BAYER SCHERING PHARMA A.G. (hereinafter collectively "Defendants" or "Bayer") for equitable relief, monetary restitution, and compensatory and punitive damages, arising from injuries sustained as a result of their exposure to the drug product Trasylol®.

### The Parties

2.      Plaintiff Hunter Smith is a citizen of the State of Indiana.  Mr. Smith was exposed to Trasylol® on March 28, 2005 and suffered renal failure shortly thereafter.

3.    Defendant BAYER CORPORATION is a corporation formed in the State of Indiana with its principal place of business located in Pittsburgh, Pennsylvania.  At all times material to this lawsuit, Bayer was engaged in the business of developing, manufacturing, licensing, promoting, marketing, distributing, testing, warranting and/or selling in interstate commerce throughout the United States, either directly or indirectly, the drug product Trasylol.

4.    Defendant BAYER HEALTHCARE PHARMACEUTICALS INC., as successor in interest of BAYER PHARMACEUTICALS CORPORATION, is a wholly owned subsidiary of Defendant Bayer Corporation, incorporated in the state of Delaware, with its principal place of business located in Wayne, New Jersey.   Prior to January 1, 2008, Bayer Pharmaceuticals Corporation was a wholly owned subsidiary of Defendant Bayer Corporation.   Bayer Pharmaceuticals Corporation's principal place of business was located in West Haven, Connecticut.  The development of Trasylol for sale in the United States, the conduct of clinical studies, the preparation of regulatory applications, the maintenance of regulatory records, the labeling and promotional activities regarding Trasylol, the decision to suspend marketing of Trasylol, and other actions central to the allegations of this lawsuit, were undertaken by Defendant Bayer Pharmaceuticals Corporation in the State of Connecticut.

5.    At all times material to this lawsuit, Bayer Pharmaceuticals Corporation was engaged in the business of developing, manufacturing, licensing, promoting, marketing, distributing, testing, warranting and/or selling in interstate commerce and the State of Connecticut, either directly or indirectly, the pharmaceutical Trasylol, also known as Aprotinin. The development of Trasylol for sale in the United States, the conduct of clinical studies, the

2

preparation of regulatory applications, the maintenance of regulatory records, the labeling and promotional activities regarding Trasylol, the decision to suspend marketing of Trasylol, and other actions central to the allegations of this lawsuit, were undertaken by Defendant Bayer Pharmaceuticals Corporation in the State of Connecticut. As such, this District and the State of Connecticut are the fora where the conduct causing Plaintiff' injuries occurred.

6.     Defendant BAYER SCHERING PHARMA A.G., a healthcare and medical products company, is a German corporation with its principal place of business in Leverkusen, Germany. At all times relevant herein, Bayer Schering Pharma A.G., and its predecessor Bayer A.G., was in the business of designing, testing, manufacturing, distributing and promoting certain pharmaceutical products, including Trasylol.

## Jurisdiction and Venue

7.     The Court has jurisdiction over this civil actions pursuant to 28 U.S.C. § 1332(a) inasmuch as the amount in controversy (with respect to each individual plaintiff in this action) exceeds $75,000.00 and the Plaintiff are citizens of different states than the Defendants.

8.     Venue in this district for pretrial proceedings in these civil actions is proper under 28 U.S.C. § 1391, inasmuch as a substantial part of the events or omissions giving rise to the claim occurred in this district and one or more defendants are subject to personal jurisdiction in this district at this time.

## Allegations of Fact

9.     Trasylol® is the brand name of a drug product known generically as "aprotinin for injection", which is available for medical use only by prescription.     It is a member of a

class of prescription drug products known as Antifibrinolytics, which are used as a means of controlling or reducing bleeding and limiting or avoiding blood transfusions in current medical practice.  Since the early 1990's, antifibironlytic therapies have been widely accepted by the medical community for use during cardiac and other types of surgery to reduce the number of patients requiring blood transfusion and to reduce total blood loss.

10.     The aprotinin protein, which is the active pharmaceutical ingredient in Trasylol, is a naturally occurring proteolytic enzyme inhibitor derived from bovine lung tissue. Aprotinin consists of 58 amino acid residues in a single-chain polypeptide, consisting of 6512 daltons and is cross-linked by three disulfide bridges.  The reactive bond site for Aprotinin is lysine – 15 – alanine – 16, and it forms reversible stoichiometric complexes.

11.     Aprotinin was first discovered in or about 1930 in Germany.  Since the 1950's, Aprotinin was sold outside the United States as a treatment for acute pancreatitis and for several other indications.  Trasylol is manufactured in Germany by Bayer Schering Pharma A.G.

12.     From 1994 to 2007, Bayer sold Trasylol in the United States in 100 and 200 milliliter vials.  When used during surgery, Trasylol was generally delivered to the patient intravenously in the operating room by a health care professional and without the specific knowledge of the patient.

13.     Amicar® (epsilon-aminocaproic acid or "EACA") and Cyklokapron® (tranexamic acid or "TEA") are additional drug products in the antifibrinolytic class.   EACA

was first sold in the United States in or about 1964, and TEA was first sold in the United States in or about 1986.

14.    In 1987, a study was published by Dr. David Royston *et al.* in *The Lancet* suggesting that the use of aprotinin in repeat CABG surgery would reduce blood loss and the need for transfusions in patients undergoing coronary artery bypass graft (also known as "CABG") surgery.

15.    In December 1993, the U.S. Food and Drug Administration (the "FDA") approved Trasylol for sale in interstate commerce in the United States as a prescription drug product and approved Trasylol's principal label, known as the "Package Insert," based on the criteria employed by the federal agency pursuant to the federal Food, Drug and Cosmetic Act, 21 U.S.C. § 321 *et seq.*  In that package insert, Trasylol was indicated "for prophylactic use to reduce perioperative blood loss and the need for blood transfusion in patients undergoing cardiopulmonary bypass in the course of repeat coronary artery bypass graft surgery [and] in selected cases of primary coronary artery bypass graft surgery where the risk of bleeding is especially high . . . or where transfusion is unavailable or unacceptable."

16.    According to the FDA, the risk of renal toxicity associated with exposure to Trasylol was known to Bayer in 1993.  According to Dr. Dennis Mangano, M.D., Ph.D., of the Ischemia Research and Education Foundation, despite pre-existing clinical and animal evidence, only a minority of 45 clinical studies conducted on aprotinin exposure during surgery prior to FDA's approval in 1993 commented on renal function and, of those, none had an

adequate number of patients to determine, with statistical significance, whether Trasylol exposure increased the risk of renal failure.

17.     In October 1994, the FDA approved amendments to the Trasylol Package Insert to provide an optional, lower dosage regimen of aprotinin.

18.     In August 1997, the FDA approved amendments to the Trasylol Package Insert to highlight information about the risk of anaphylactic shock and certain other adverse effects associated with exposure to aprotinin.

19.     In August 1998, the FDA approved amendments to the Trasylol Package Insert. In that package insert, Trasylol was indicated for use during both primary and repeat CABG surgeries.

20.     On information and belief, between August 1998 and December 2006, no material safety information was reviewed and either approved or deemed not approvable by the FDA for inclusion in the Trasylol Package Insert.

21.     On information and belief, the FDA required Bayer to conduct certain post-approval clinical studies and/or evaluations and analyses as conditions of the its approval of the revised Package Insert in 1998.  On information and belief, Bayer either did not fulfill those obligations and/or did not conduct those clinical studies and/or evaluations and analyses so as to generate clinically meaningful information about the safety of Trasylol.

22.     On information and belief, Bayer did not conduct any clinical studies comparing the safety and efficacy of Trasylol with EACA and/or TEA.

23.     Bayer aggressively promoted Trasylol to physicians through medical journal advertisements, mass mailings, and direct communications from the Bayer sales force, among other methods.   On information and belief, Bayer sponsored continuing medical education ("CME") seminars and paid physicians to advocate the use of Trasylol, orally and in writing, over the use of other antifibrinolytics and in various types of surgery, and to downplay the significance of the adverse effects of Trasylol.

24.     Bayer regularly represented in its advertising and promotional messages that the risk of renal and certain other injuries including death, associated with exposure to Trasylol were "comparable to placebo" and other similar messages.   These messages represented to physicians that Trasylol did not cause more renal and certain other injuries than the number of injuries resulting from surgery without the use of Trasylol.   In other advertising and promotional messages, Bayer overstated the benefits of Trasylol.

25.     According to Bayer, an estimated 4.3 million patients were given Trasylol. Bayer estimated that Trasylol sales generated about $293 million in 2005 alone, making it the company's 11th largest-selling drug.   In late 2005, Bayer forecast that Trasylol would someday generate upwards of $600 million annually.

26.     On January 26, 2006, *The New England Journal of Medicine* ("NEJM") published an article by Dr. Mangano *et al.* reporting an association of Trasylol (aprotinin injection) with renal toxicity and renal failure and ischemic events (myocardial infarction and stroke) in patients undergoing coronary artery bypass grafting surgery.   This study was an

observational study of patients who received either Trasylol, EACA or TEA, or no specific drug treatment.

27.     Overall, Dr. Mangano found a more than doubling in the risk of renal injury in patients exposed to aprotinin compared to those patients not exposed (odds ratio of 2.52 (1.66-3.82)) as well as an increased risk of cardiovascular and cerebrovascular adverse events and death.

28.     In another publication, in the medical journal *Transfusion*, on January 20, 2006, Dr. Karkouti *et al.* also suggested an association between the use of aprotinin and renal toxicity among patients undergoing cardiac surgery with cardiopulmonary bypass.

29.     On February 1, 2006, Bayer contacted Dr. Alex Walker, a highly respected Harvard-trained physician and pharmacoepidemiologist and the Senior Vice President for Epidemiology at a company named "i3" regarding the possibility of conducting its own retrospective study to compare Trasylol with EACA and TEA in response to the study published by Dr. Mangano *et al.*

30.     In May 2006, the FDA announced that it would convene a meeting of its Cardiovascular and Renal Drugs Advisory Committee on September 21, 2006, to evaluate the data regarding Trasylol.  In a contract signed by Bayer and Dr. Walker's company, i3, Bayer specifically requested that a preliminary report of Dr. Walker's study be provided to Bayer in time for it to be considered by the FDA's advisory committee.

31.     Bayer received a preliminary report of Dr. Walker's study on or about September 14, 2006.  On information and belief, the report of the study confirmed that there

was an increased risk of renal and certain other injuries in patients exposed to Trasylol versus those exposed to EACA or TEA.   Bayer did not inform the FDA about the work being conducted by Dr. Walker or existence of the preliminary report until after the September 21, 2006 Cardiovascular and Renal Drugs Advisory Committee meeting.

32.     Following an independent investigation of Bayer's conduct with respect to the disclosure of Dr. Walker's study, it was concluded that "[Bayer]'s scientific leaders opposed contracting for the i3 study because they were skeptical about its potential scientific value. This negative view colored the approach to disclosure." And, "Bayer management handled the study in a way that diminished its visibility and importance to the [company] leaders. Management assigned responsibility for the i3 study to [Bayer officials] in Germany without establishing clear lines of communication to the [company] leaders coordinating Bayer's preparation for the Advisory Committee meeting; thus, the i3 study was a secondary priority in the minds of these [Bayer] leaders."

33.     As a result of the recommendations of the FDA's advisory committee, the articles authored by Mangano *et al.* and Karkouti *et al.*, other reports and data known to and/or in the possession of the Defendants, the FDA required that the package insert for Trasylol include additional Warnings and Precautions, beginning in December 2006, regarding the risks of renal injury and renal failure associated with the use of aprotinin and recommended that aprotinin be reserved for patients who are at increased risk of blood loss and blood transfusion.

34.     The FDA described the December 2006 amendments to the Trasylol package insert as follows:

The new labeling for Trasylol (December 2006) has a more focused indication for use, a new Warning about renal dysfunction, a revised Warning about anaphylactic reactions, and a new Contraindication. Trasylol is now indicated only for prophylactic use to reduce peri-operative blood loss and the need for blood transfusion in patients who are at *an increased risk for blood loss and blood transfusion* undergoing cardiopulmonary bypass in the course of coronary artery bypass grafting (CABG) surgery. Trasylol should be administered only in the operative setting where cardiopulmonary bypass can be started quickly. Trasylol should not be administered to any patient with a known or suspected exposure to Aprotinin within the past 12 months.

FDA is evaluating additional recently submitted epidemiological safety study data (discussed below), in the context of all other safety and efficacy information available on Aprotinin. This review may result in other actions, including additional changes to the full prescribing information (product labeling).

35. In October 2007, Bayer was notified that the Executive Committee of a Canadian-based clinical study of Trasylol in high-risk cardiac surgery patients had halted the study. A planned periodic data analysis in this clinical trial, the *Blood conservation using antifibrinolytics: A randomized trial in a cardiac surgery population* ("BART") study conducted by the Ottawa Health Research Institute, indicated an increase in all-cause mortality (that almost reached conventional statistical significance for 30-day mortality) for patients in the Trasylol treatment arm compared to patients who received the alternative drug products EACA or TEA.

36. On or about November 5, 2007, Defendants discontinued the sale of Trasylol. The FDA stated at that time: "[I]t is not possible to determine and identify a population of patients undergoing cardiac surgery for which the benefits of Trasylol outweigh the risks."

37.    On or about March 28,2005 Plaintiff Hunter Smith had open heart surgery at the The Indiana Heart Hospital in Indiana.   During the surgery, and with no contributory negligence on his part, Mr. Hunter was administered Trasylol, a pharmaceutical product designed, manufactured, promoted, distributed and sold by Defendants.

38.    As a direct, proximate, and legal result of the negligence, carelessness, and other wrongdoing of the Defendants, as described herein, Plaintiff began experiencing renal insufficiency soon after heart surgery, and subsequently went into acute renal failure.

39.    As a direct, proximate, and legal result of the negligence, carelessness, and other wrongdoing of the Defendants, as described herein, Plaintiff sustained devastating injuries, including but not limited to, renal failure, which caused unnecessary pain and suffering.

**Claims for Relief**

COUNT I - STRICT LIABILITY - FAILURE–TO–WARN

40.    Plaintiff hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

41.    Defendants are liable to Plaintiff under CPLA, Conn. Gen. Stat. §52-272m *et seq.* for innocent, negligent and/or willful failure to provide adequate warnings and other clinically relevant information and data regarding the appropriate use of Trasylol to Plaintiff and to the health care providers that prescribed and administered Trasylol to them.

42.    Defendants, as manufacturers of pharmaceutical drugs, are held to the level of knowledge of an expert in the field, and further, Defendants knew or should have known that warnings and other clinically relevant information and data which they distributed regarding

the risks of renal and other injuries and death associated with the use of Trasylol, either compared to the use of other drug products in the class of antifibrinolytics and/or compared to the use of no antifibrinolytic, were inadequate.

43.     Plaintiff did not have the same knowledge as Defendants and no adequate warning or other clinically relevant information and data was communicated to them or to their physicians.

44.     Defendants had a continuing duty to provide consumers, including Plaintiff, and their physicians with warnings and other clinically relevant information and data regarding the risks and dangers associated with Trasylol, as it became or could have become available to Defendants.

45.     Defendants marketed, promoted, distributed and sold an unreasonably dangerous and defective prescription drug, Trasylol, to health care providers empowered to prescribe and dispense Trasylol to consumers, including Plaintiff, without adequate warnings and other clinically relevant information and data and, through both omission and affirmative misstatements, misled the medical community about the risk and benefit balance of Trasylol, which resulted in injury to Plaintiff.

46.     Despite the fact that Defendants knew or should have known that Trasylol caused unreasonable and dangerous side effects when either compared to the use of other drug products in the class of antifibrinolytics and/or compared to the use of no antifibrinolytic, which many users would be unable to avoid by any means, they continued to promote and

market Trasylol without stating that there existed safer and more or equally effective alternative drug products and/or providing adequate clinically relevant information and data.

47.     Defendants knew or should have known that consumers, and Plaintiff specifically, would foreseeably and needlessly suffer injury as a result of Defendants' failures.

48.     Defendants failed to provide timely and adequate warnings to physicians, distributors, and consumers, including Plaintiff and their physicians, in the following ways:

(1) Defendants failed to include adequate warnings and/or providing adequate clinically relevant information and data that would alert Plaintiff and their physicians to the dangerous risks of Trasylol of, among other things, kidney failure and death;

(2) Defendants failed to provided adequate post-marketing warnings and instructions after the Defendants knew or should have known of the significant risks of, among other things, kidney failure and death;

(3) Defendants continued to aggressively promote Trasylol, even after it knew or should have known of the unreasonable risks kidney injury and death from this drug.

49.     Defendants had a constitutionally-protected right to provide Plaintiff and their physicians with truthful clinically-relevant information and data and warnings regarding the adverse health risks associated with exposure to Trasylol and/or that there existed safer and more or equally effective alternative drug products.

50.     By failing to provide Plaintiff and their physicians with adequate clinically relevant information and data and warnings regarding the adverse health risks associated with exposure to Trasylol, and/or that there existed safer and more or equally effective alternative drug products, Defendants breached their duty of reasonable care and safety to the Plaintiff.

51.     Defendants' actions described above were performed willfully, intentionally, and with reckless disregard of the life and safety of the Plaintiff and the public.

52.     Defendants' actions described above violated the federal and state Food, Drug and Cosmetic Acts and rendered Trasylol misbranded.

53.     As a direct and proximate result of the actions and inactions of the Defendants as set forth above, Plaintiff were exposed to Trasylol and suffered injuries.

<u>COUNT II - STRICT LIABILITY – DESIGN DEFECT</u>

54.     Plaintiff hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

55.     Defendants are liable to Plaintiff under CPLA, Conn. Gen. Stat. §52-272m *et seq.* for the injuries and damages sustained by Plaintiff due to the defective design and/or formulation of Trasylol.

56.     At all times material to these allegations, Defendants manufactured, distributed, and sold Trasylol, which was administered to Plaintiff during surgery.

57.     Defendants, as manufacturers of pharmaceutical drugs, are held to the level of knowledge of an expert in the field.

58.     The Trasylol administered to Plaintiff was defective in design or formulation in the following respects:

(1) When it left the hands of the Defendants, this drug was unreasonably dangerous to the extent beyond that which could reasonably be contemplated by Plaintiff or their physicians;

(2) Any benefit of this drug was outweighed by the serious and undisclosed risks of its use when prescribed and used as the Defendants intended;

(3) The dosages and/or formulation of Trasylol sold by the Defendants were unreasonably dangerous;

(4) There are no patients for whom the benefits of Trasylol outweighed the risks; and/or

(5) There are no patients for whom Trasylol is a safer and more efficacious drug than other drug products in its class.

59.     The Trasylol administered to Plaintiff was defective at the time it was distributed by the Defendants or left their control.

60.     The Trasylol administered to Plaintiff was expected to reach the user without substantial change in the condition in which it was sold.

61.     The Trasylol administered to Plaintiff reached them without substantial change in the condition in which it was sold.

62.     Plaintiff were the type of patients which the Defendant reasonably expected would be administered Trasylol.

63.     Defendants were entitled to withdrawn Trasylol from the market at any time, but failed to do so in a timely and responsible manner.

64.     The defects in the Trasylol administered to Plaintiff were a direct and proximate cause of their injuries.

## COUNT III – NEGLIGENCE

65.     Plaintiff hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

66.     Defendants are liable to Plaintiff under CPLA, Conn. Gen. Stat. §52-272m *et seq.* due to their negligent development, study, manufacture, distribution and sale of Trasylol.

67.     At all times relevant to this lawsuit, Defendants owed a duty to consumers, including Plaintiff and their health care providers to assess, manage, and communicate the risks, dangers, and adverse effects of Trasylol and to suspend distribution and sale of Trasylol when Defendants discovered it to be unreasonably dangerous.

68.     Defendants' duties included, but were not limited to, carefully and properly designing, testing, manufacturing, promoting, selling, and/or distributing Trasylol into the stream of commerce, and providing adequate information regarding the appropriate use of this drug product.

69.     Defendants negligently and carelessly breached the above-described duties to Plaintiff by committing negligent acts and/or omissions including, but not limited to, the following:

(1) Defendants failed to use ordinary care in designing, testing, and manufacturing Trasylol so as to reveal and communicate the high risk to users of unreasonable, dangerous side-effects, some of which are fatal, such as renal failure when either compared to the use of alternative drug products in its class or compared to the use of no drug products;

(2) Defendants failed to accompany Trasylol with adequate information that would alert doctors, consumers, and other users to the potential adverse side effects associated with the use of these drugs and the nature, severity and duration of such adverse effects either compared to the use of alternative drug products in its class or compared to the use of no drug products;

(3) Defendants failed to conduct adequate non-clinical and clinical testing and post-marketing surveillance and analyses to determine and communicate the safety profile and side effects of Trasylol either compared to the use of alternative drug products in its class or compared to the use of no drug products;

(4) Defendants failed to warn Plaintiff or their physicians prior to actively encouraging the sale of Trasylol, either directly or indirectly, orally or in writing, about the possibility of renal failure, injury and death as a result of the use of this drug, either compared to the use of alternative drug products in its class or compared to the use of no drug products;

(5) Defendants continued to promote the safety and effectiveness of Trasylol, while downplaying its risks, even after Defendants knew or should have known of the

risks of Trasylol, either compared to the use of alternative drug products in its class or compared to the use of no drug products;

(6) Defendants knew or should have known that the use of Trasylol involved a risk of kidney failure, renal injury, and death and/or that Trasylol was unreasonably dangerous either compared to the use of alternative drug products in its class or compared to the use of no drug products and failed to communicate that information to Plaintiff and their physicians;

(7) At the time of Decedent's surgery, Defendants had or should have had scientific data which indicated the true association between the use of Trasylol and the risk of kidney failure, renal injury, and death, either compared to the use of alternative drug products in its class or compared to the use of no drug products, and could have distributed that information to Plaintiff and their physicians even if that information was not included in the FDA-approved product labeling;

(8) Defendants failed to provide consumers, like Plaintiff and their health care providers, with scientific data which indicated that Trasylol was unreasonably dangerous either compared to the use of alternative drug products in its class or compared to the use of no drug products, that there were no patients in whom the benefits of Trasylol outweighed the risks, and failed to promptly withdraw Trasylol from the market; and

(9) Defendants were otherwise careless or negligent.

70.     Although Defendants knew or should have known that Trasylol caused unreasonably dangerous side effects, either compared to the use of alternative drug products in its class or compared to the use of no drug products, which many users would be unable to remedy by any means, Defendants continued to market this drug for use in surgeries, when there were safer and less expensive alternatives available.

71.     Defendants knew or should have known that consumers, like the Plaintiff, would suffer injury as a result of Defendants' failure to exercise ordinary care, as described above. Defendants, as manufacturers of drug products, are held to the level of knowledge of an expert in the field.

72.     As a direct and proximate cause of Defendants' negligent acts and/or omissions, Plaintiff suffered injuries.

<u>COUNT IV – NEGLIGENT MISREPRESENTATION AND OMISSION</u>

73.     Plaintiff hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

74.     Defendants are liable to Plaintiff under CPLA, Conn. Gen. Stat. §52-272m *et seq.* for innocent and/or negligent misrepresentations regarding the safety, efficacy, and risk/benefit ratio of Trasylol, either compared to the use of alternative drug products in its class or compared to the use of no drug products, to Plaintiff and to the health care providers that prescribed, recommended, ordered, and administered Trasylol to him.

75.     Through their actions and omissions in advertising, promoting, and otherwise, Defendants made public misrepresentations of material facts to, and/or omitted material facts

from physicians and consumers like Plaintiff, concerning the character and safety of Trasylol, either compared to the use of alternative drug products in its class or compared to the use of no drug products.

76.    Defendants were entitled to provide consumers, like Plaintiff, and their health care providers with scientific data which indicated an association between the use of Trasylol and the a risk of kidney failure, renal injury, other injuries, and death, either compared to the use of alternative drug products in its class or compared to the use of no drug products, and could have distributed that information to Plaintiff and their physicians even if that information was not included in the package insert.  Defendants were entitled to provide consumers, like Plaintiff, and their health care providers with bona fide scientific data which indicated that Trasylol was unreasonably dangerous either compared to the use of alternative drug products in its class or compared to the use of no drug products, that there were no patients in whom the benefits of Trasylol outweighed the risks, or could have withdrawn Trasylol from the market at any time.

77.    Those public misrepresentations and omissions include, but are not limited to, those set forth in the general allegations section of this Complaint.  Those misrepresentations and omissions further include, but are not limited to, the following:

(1) Defendants failed to disclose that pre-clinical and clinical testing and post-marketing surveillance was inadequate to determine the safety and side effects of Trasylol, either compared to the use of alternative drug products in its class or compared to the use of no drug products;

20

(2) Defendants failed to timely disclose, and/or intentionally concealed, data showing that Trasylol use dramatically increased the risk for renal failure and other injuries and death, either compared to the use of alternative drug products in its class or compared to the use of no drug products;

(3) Defendants failed to include adequate warnings with Trasylol about the potential and actual risks, and nature, scope, severity, and duration of any serious side effects of this drug, including without limitation, the risk of renal failure, other injuries and death, either compared to the use of alternative drug products in its class or compared to the use of no drug products; and

(4) Defendants concealed and continue to conceal past and present facts – including that Defendants were aware of and concealed their knowledge of an association between the use of Trasylol and dangerous side effects, including renal failure and death – from the consuming public, including Plaintiff.

78.     Defendants' above-described acts and/or omissions were performed willfully, intentionally, and with reckless disregard for Plaintiff and the public.

79.     Defendants knew or should have known that these representations were false and that Plaintiff and their physicians would rely on them.  Defendants were obligated to disclose the foregoing risks, but failed to adequately and timely do so even after they were in possession of information concerning those risks.  Defendants' representations that Trasylol was safe for its intended use, either compared to the use of alternative drug products in its class or compared to the use of no drug products, were false, since this drug was, in fact,

unreasonably dangerous to the health of Plaintiff when used during surgery, and there were alternative products in the same class of drug products available that were less expensive, equally or more effective, and posed less risks.

80. In the alternative, Defendants failed to exercise reasonable care in ascertaining the accuracy of the information they provided regarding the safe use of Trasylol and communicating that information to Plaintiff and their physicians.

81. At the time of Defendants' misrepresentations and concealment, Plaintiff and their physicians were not aware of the falsity of the foregoing representations, nor were they aware that material facts concerning Trasylol had been concealed or omitted. In reliance upon Defendants' misrepresentations, Plaintiff' physicians were induced to and did administer Trasylol to Plaintiff before, during, and/or after surgery.

82. Defendants are entitled to provide consumers, like Plaintiff, and their health care providers with truthful scientific information and data regarding the association between exposure to Trasylol and the a risk of kidney failure, renal injury, other injuries, and death and could have distributed that information to Plaintiff and their physicians even if that information was not included in the package insert. Defendants were entitled to provide consumers, like Plaintiff, and their health care providers with scientific information and data which indicated that Trasylol was unreasonably dangerous, that there were no patients in whom the benefits of Trasylol outweighed the risks, either compared to the use of alternative drug products in its class or compared to the use of no drug products.

83.     If Plaintiff and their physicians had known the true facts concerning the risks of the use of Trasylol, in particular the risk of renal failure, other injuries and death, either compared to the use of alternative drug products in its class or compared to the use of no drug products, they would not have used Trasylol and would have used one of the alternatives in that class of drug products.

84.     The reliance of Plaintiff and their physicians upon Defendants' misrepresentations was justified, among other reasons, because said misrepresentations and omissions were made by individuals and entities who were in a position to know the true facts concerning Trasylol, while Plaintiff and their physicians were not in a position to know the true facts, and because Defendants overstated the benefits and safety of Trasylol and concomitantly downplayed the risks in its use, either compared to the use of alternative drug products in its class or compared to the use of no drug products, thereby inducing Plaintiff' physicians to use Trasylol in lieu of other, safer alternatives.  At all times relevant hereto, Defendants' corporate officers, directors and/or managing agents knew or should have known of and ratified the acts of Defendants, as alleged herein.

85.     Defendants' misrepresentations, concealment, suppression and omissions were made willfully, wantonly, uniformly, deliberately or recklessly, in order to induce Plaintiff to be administered Trasylol, and Plaintiff and their physicians did reasonably and justifiably rely upon the material misrepresentations and omissions made by the Defendants when agreeing to utilize Trasylol.

86.    As a direct and proximate result of the reliance of Plaintiff and their physicians on Defendants' misrepresentations and concealment concerning the risks and benefits of Trasylol, Plaintiff suffered injuries.

COUNT V – BREACH OF IMPLIED WARRANTIES

87.    Plaintiff hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

88.    Defendants are liable to Plaintiff under CPLA, Conn. Gen. Stat. §52-272m *et seq.* for their breach of implied warranties.

89.    Trasylol was designed, tested, manufactured, distributed, promoted and sold by the Defendants; and was expected to, and did, reach Plaintiff without a substantial change in its condition.

90.    Defendants, through advertising and promotional materials and the statements of sales representatives and paid endorsers, impliedly warranted that Trasylol was safe for the use for which it was intended.

91.    Defendants breached said implied warranties in that Trasylol was unsafe in light of the risk of life-threatening side effects associated with its use, including, but not limited to, renal failure, other injuries, and death.

92.    Plaintiff and their physicians relied to their detriment on Defendants' implied warranties.

93.    As a direct and proximate result of Defendants' breach of implied warranties, Plaintiff suffered injuries.

## COUNT VI - UNFAIR AND DECEPTIVE TRADE PRACTICES

94.    Plaintiff hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

95.    Defendants are liable to Plaintiff under the Connecticut Unfair Trade Practices Act (CUTPA), Conn. Gen. Stat. § 42-110a *et seq*.  Wholly separate and apart from the personal injuries sustained by Plaintiff, Plaintiff further suffered financial injury.

96.    Defendants have a statutory duty to refrain from unfair or deceptive acts or trade practices in the design, development, manufacture, promotion, and sale of the drug products.

97.    Defendants financed, assisted, supported and participated in the promotion and use of Trasylol in order to create consumer demand for the drug.

98.    Defendants deliberately misrepresented the safety of Trasylol and intentionally concealed the risks attendant to use of the drug.  In so doing, Defendants intended to and did affect the decisions of consumers and their health care providers to purchase, prescribe and use Trasylol, to the exclusion of not using a drug product or using either of the substantially cheaper alternative drugs in the same class.

99.    Defendants, while engaged in the conduct and practices identified above, committed one or more violations of state laws, including, but not limited to, the following:

(1) Defendants made false and misleading representations and omissions of material facts regarding Trasylol;

25

(2) Defendants concealed and otherwise failed to publicize the risks and injuries associated with Trasylol in order to promote sales of the drug and maximize profits; and

(3) Defendants engaged in advertising and promotion of Trasylol without conducting sufficient pre-clinical and clinical testing and adequate post-marketing surveillance and analysis of Trasylol.

100.    Defendants thereby intended to and did affect the price of Trasylol, unfairly and deceptively maintaining the price of Trasylol at an inflated level not otherwise obtainable and caused Plaintiff and the consuming public generally to pay more for the drug than was warranted or than they would otherwise have paid in the absence of Defendants' misrepresentations and concealment.

101.    The above-described conduct, practices, acts and omissions were immoral, oppressive, unethical and/or unscrupulous, in violation of international treaty and law, and/or offend public policy.

102.    The above-described conduct, practices, acts and omissions caused consumers permanent and substantial financial loss, which loss could not reasonably have been avoided, and which was not outweighed by any countervailing benefit to the consuming public. Consumers in general, and Plaintiff in particular, incurred unnecessary expenses for a product that was purchased only because of the unfair, unscrupulous, oppressive and/or deceptive acts or practices of the Defendants.

103.    As a consequence of Defendants' wrongful conduct, Plaintiff suffered an ascertainable financial loss: the difference between the price paid for Trasylol as a result of the Defendants' unfair trade practices and the cost of any of the substantially cheaper, and safer, drug alternatives.

## COUNT VII – PUNITIVE DAMAGES

104.    Plaintiff hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

105.    Plaintiff are entitled to punitive damages pursuant to Conn. Gen. Stat. §§ 52-572m, et seq. and 42-110a *et seq.* because Defendants' actions were reckless and without regard for the public's safety and welfare.  Defendants misled both the medical community and the public at large, including Plaintiff and their physicians, by making false representations about and concealing pertinent information regarding Trasylol.   Defendants downplayed, understated and disregarded its knowledge of the serious and permanent side effects associated with the use of Trasylol, including renal failure and death, despite information demonstrating the product was unreasonably dangerous.

106.    The conduct of the Defendants in designing, testing, manufacturing, promoting, advertising, selling, marketing, and distributing Trasylol, and in failing to warn Plaintiff and other members of the public of the dangers inherent in the use of Trasylol, which were known to the Defendants, was attended by circumstances of malice, avarice, or willful and wanton conduct, done heedlessly and recklessly, without regard to consequences, or of the rights and safety of others, including Plaintiff.

107.   At all times material hereto, Defendants had a duty to exercise reasonable care in the design, manufacture, testing, research and development, processing, advertising, marketing, labeling, packaging, distribution, promotion and sale of Trasylol.

108.   Defendants breached their duty and were wanton and reckless in their actions, misrepresentations, and omissions toward the public generally, and Plaintiff specifically, in the following ways:

(1) Upon information and belief, Defendants actually knew of Trasylol's defective nature, as set forth herein, but continued to design, manufacture, market, and sell Trasylol so as to maximize sales and profits at the expense of the health and safety of the consuming public, including Plaintiff, and in conscious disregard of the foreseeable harm caused by Trasylol;

(2) Defendants spent millions of dollars a year researching and developing medicines and aggressively marketing Trasylol, but devoted far less attention to conducting sufficient pre-clinical testing, clinical testing, comparison testing, and adequate post-marketing surveillance of this drug; and

(3) Defendants continued to promote the safety of Trasylol, while providing no warnings at all about the unreasonable risk to consumers of death, kidney failure, congestive heart failure, and stroke associated with it, even after Defendants knew of that risk from multiple studies.

109.   Defendants knew that Trasylol had unreasonably dangerous risks and caused serious side effects of which Plaintiff and their physicians would not be aware.  Defendants

nevertheless advertised, marketed, distributed, and sold the medicine knowing that there were safer methods and products available.

110.   Defendants' above-described actions were performed willfully, intentionally, and with reckless disregard for the rights of Plaintiff and the public.

111.   One or more of the aforesaid violations of law by the Defendants were committed with reckless disregard for the safety of the public and of the Plaintiff as a product user.

112.   One or more of the aforesaid violations of law by Defendants were committed willfully and deliberately, and caused substantial financial injury to the consuming public and Plaintiff.

113.   As a direct and proximate result of the wanton and reckless actions and inactions of the Defendants as set forth above, Plaintiff are entitled to punitive damages.

**WHEREFORE**, Plaintiff request that the Court grant the following relief against Defendants, Bayer Corporation, Bayer Healthcare Pharmaceuticals Inc., and Bayer Schering Pharma AG, jointly and severally, on all counts of this Complaint, including:

(A)   Money Damages representing fair, just and reasonable compensation for their respective common law and statutory claims;

(B)   Punitive and/or Treble Damages pursuant to state law;

(C)   Attorneys' fees pursuant to state law;

(D)     Pre- and post-judgment interest as authorized by law on the judgments which

         enter on Plaintiff' behalf;

(E)     Costs of suit; and

(F)     Such other relief as is deemed just and appropriate.

                                                      THE PLAINTIFF,

                              By: _____
                                                      Neal L. Moskow, Esq.
                                                      Fed Bar No.:  ct 04516
                                                      URY & MOSKOW, L.L.C.
                                                      883 Black Rock Turnpike
                                                      Fairfield, CT 06825
                                                      Telephone (203) 226-8088
                                                      Facsimile (203) 610-6399
                                                      neal@urymoskow.com

                                                      **COUNSEL FOR PLAINTIFF**

OF COUNSEL

David L. Rosenband
Weitz & Luxenberg, P.C.
700 Broadway
New York, New York 10003
Direct (212) 558-5915
Facsimile (212) 363-2721
DRosenband@weitzlux.com
                              **PLAINTIFF REQUEST A TRIAL BY JURY.**